BUTLER v. ELLERBE.

1. REGISTRATION LAWS—STATE—PARTIES.—An action by a taxpayer to restrain the comptroller general from drawing his warrants, and the State treasurer from paying such warrants, for the salaries of officers of registration and election, provided for in the general appropriation act, on the ground that the registration laws of the State are unconstitutional, null,

and void, is not an action against the State, nor is the State an indispensable party thereto. MR. JUSTICE GARY *dissenting*.

2. STATUTE—CONSTITUTIONALITY—DECISION.—An act of the legislature will not be declared unconstitutional where there are other grounds upon which the case can be fully disposed of.

3. IBID.—IBID.—CONSTITUTION—EQUITY—STATE—ESTOPPEL.—*Per* GARY, A. J. The State would not be permitted to deny her liability for the salaries of her registration and election officers for services rendered by her direction on the plea that the registration law was unconstitutional; and, therefore, the Court of Equity will not, at the instance of a citizen and taxpayer of the State, enjoin the fiscal officers of the State from paying the appropriation made by the legislature for such payments.

4. IBID.—IBID.—IBID.—IBID.—*Per* POPE, A. J. A court of equity, in action to enjoin the payment of appropriations made by the legislature for registration and election officers, will not grant the relief demanded, nor consider the constitutionality of the registration laws, where the petition does not show that the petitioner, or any other person entitled, has been denied his rights of registration and voting.

5. EQUITY—LEGAL REMEDIES.—*Per* POPE, A. J. Equity will not grant relief where there is a plain and adequate remedy at law, and, therefore, the petition for injunction in this case should be refused, as there are at least two remedies at law.

6. REGISTRATION LAWS—CONSTITUTION.—The question of the constitutionality of the registration laws of South Carolina raised, but not considered, except by MR. CHIEF JUSTICE MCIVER, who expressed the opinion that they were unconstitutional, because unreasonable in their requirements, and requiring of an elector more than the Constitution prescribed.

This was an original application to this court for injunction, M. C. Butler being the petitioner, and W. H. Ellerbe, comptroller general, and W. T. C. Bates, State treasurer, being the respondents.

*Messrs. Bachman & Youmans* and *Douglass & Obear,* for petitioner.

*Mr. Buchanan,* attorney general, contra.

July 6, 1895.   The opinion of the court was delivered by

MR. JUSTICE GARY.   This action was instituted in this court, in its original jurisdiction, for an injunction against the defendants, as State officers, to restrain them from applying the public

funds in the State treasury to the payment of certain appropri-
ations made by the legislature, which, it is claimed, are illegal.
The appropriations alleged to be illegal are those made in the
appropriation act of 1893 for the pay of supervisors of registra-
tion, and for the pay of commissioners, managers, and messen-
gers of elections for the fiscal year commencing 1st November,
1893.    The complaint concludes with the following allegations:
"And your petitioner avers, on information and belief, that
portions of said appropriations are still in the treasury, un-
drawn and unpaid, as is also a portion of a previous appropria-
tion for payment of supervisors of registration; that by reason
of the premises these appropriations are made for compensation
for the performance of illegal and unconstitutional services, and
are *ultra vires* on the part of the General Assembly, and illegal,
unconstitutional, null, and void, and it is illegal and violative of
the said Constitutions for the comptroller general of the State to
draw his warrant on the State treasurer for payment of said ap-
propriations or for the said treasurer to pay them.    (11) That,
notwithstanding the premises, the said Wm. H. Ellerbe, comp-
troller general of said State, has heretofore unlawfully drawn,
and is now unlawfully drawing, and intends to continue in future
unlawfully to draw, warrants upon the said Wm. T. C. Bates,
treasurer of said State, for the payment of said appropriations,
and that the said treasurer, Wm. T. C. Bates, has heretofore un-
lawfully paid, is now unlawfully paying, and intends to continue
in future unlawfully to pay, all such warrants so drawn or to be
drawn by said comptroller general for payment of said appro-
priations.    (12) And your petitioner further shows that the
foregoing has worked and will work manifest wrong and irrep-
arable injury to your petitioner and other citizens and resident
taxpayers of the State of South Carolina, unless restrained by
this court, and that he and they are without adequate remedy
of law in this behalf.    Wherefore your petitioner prays that
said section of said act, and the entire act, as it appears in the
Acts of 1882, in the General Statutes of 1882, and the Revised
Statutes of 1893, be declared unconstitutional, null, and void;
that defendants, and the successors in office of the defendants,
*b*e restrained from any further violation of the rights of your

petitioner; and that this court may grant its writ of injunction, issuing out of and under the seal of this honorable court, perpetually enjoining the defendants, their clerks, agents, servants, or attorneys, to. wit: William H. Ellerbe, said comptroller general, and his successors in office, from drawing any warrants upon the said treasurer and his successors in office, for the payment of any amount of said appropriations, and William T. C. Bates, said treasurer, and his successors in office, from making any payment of any of said warrants drawn or to be drawn. And your petitioner prays for such other and further relief as to this honorable court may seem meet and proper."

Waiving the question as to the right of the petitioner to equitable relief, when the only injury complained of is that which does not affect him differently from all other resident taxpayers of the State (*Mauldin* v. *City Council,* 33 S. C., 1); also waiving the question that an adequate remedy is provided by the Revised Statutes (section 343 of which is as follows: "If any taxes shall be illegally assessed or collected when the same shall become known to the county auditor, he shall on demand of the party interested submit the matter to the comptroller general, and if the comptroller general approve thereof in writing, the amount so illegally collected shall be repaid to the party paying the same out of the county treasury on the order of the county auditor; and so much of said taxes as shall have been paid into the State treasury shall be refunded to the county treasury, and the county auditor shall retain the same in his next annual settlement, and charge the State therewith"); and waiving the question as to the right of the petitioner to equitable relief when the only ground for such relief is the illegality of the acts of the legislature mentioned in the petition (Cool. Tax., 760; 10 Am. & Eng. Enc. L., 857, 859; *Dows* v. *Chicago,* 11 Wall., 108; *Hannewinkle* v. *Georgetown,* 15 *Id.,* 547; *Union Pac. Railway Co.* v. *Cheyenne,* 113 U. S., 516; *City of Milwaukee* v. *Koeffler,* 116 *Id.,* 219; *Taylor* v. *Secor,* 92 *Id.,* 575; *Carroll* v. *Safford,* 3 How., 442; *State Railroad Tax Cases,* 92 U. S., 613), we are of the opinion that there are other objections to the petition, apparent upon its face, which show that the prayer thereof cannot be granted: First, the proceeding is in

effect a suit against the State; second, the State is an indispensable party; third, the question as to the constitutionality of the acts cannot properly arise, as there are other grounds upon which the court can rest its judgment; fourth, if the State could be sued, she would be estopped from interposing the objection that the services rendered at her instance and for her benefit were illegal. The appropriations show that the State desires the payment of such services. Equity will not, therefore, lend its aid to compel the State indirectly, through the defendants as her fiscal officers, to do that which the State could not be compelled to do in a direct proceeding.

In proceeding to consider these several objections to the petition, it will be well to keep in mind that the defendants are not proceeded against as individuals, but in their representative capacity as State officials, and their successors in office; that there is no allegation in the petition that any act of the defendants is attributable to them as individuals, but only in their representative capacity as State officers; that the funds sought to be affected by this proceeding have already been collected and paid into the State treasury, and are now the property of the State, and that the possession thereof by the treasurer of the State is the possession of the State itself; that the petitioner in this proceeding does not seek to enjoin the doing of any act under the registration acts; that the rights which this proceeding seeks to affect are not those of the defendants, but those of the State.

The objections that the action herein is, in effect, a suit against the State, and that the State is an indispensable party, will be considered together. These objections are jurisdictional in their nature, and may be interposed at any time, as shown by the case of *Lowry* v. *Thompson*, 25 S. C., 416, in which this court, of its own motion, raised such objection. The case of *Lowry* v. *Thompson*, *supra*, it seems to us, is decisive of this case. That was an action by James M. Lowry against Hugh S. Thompson, governor, W. E. Stoney, comptroller general, and others, as commissioners of the sinking fund, for the recovery of a title deed. Mr. Justice McIver, delivering the opinion of the divided court, says: "It will be

necessary first to dispose of the question of jurisdiction, for if it shall be determined that the court has no jurisdiction, then it would be, not only unnecessary, but improper to undertake to decide any of the other questions in the case. That a State cannot be sued in any of its courts without its express consent, which can only be given by the legislative authority, is a proposition so universally conceded as to render any argument or authority to support it wholly unnecessary. If, however, authority should be asked for, it will be found in almost every case which will be hereinafter cited, where it will be found that the proposition has been distinctly decided or expressly recognized, and we are not aware of any authority to the contrary. As it is not pretended that any such consent was given in this case, the first inquiry is, whether this is really an action against the State. The fact that the State is not named as a party to the record is not conclusive of this inquiry, though at one time it seems to have been so held in the case of *Osborn* v. *Bank*, 9 Wheat., 738, followed by *Davis* v. *Gray*, 16 Wall., 203; but these cases, so far as this particular point is concerned, are entirely inconsistent with the more recent decisions of the Supreme Court of the United States, where the rule seems now to be well settled that an action, though in form against an officer of a State, if it is in fact a suit against the State itself, cannot be maintained, even though the State is not made a party on the record. *Louisiana* v. *Jumel*, 107 U. S., 711; *Cunningham* v. *Railroad Co.*, 109 *Id.*, 446; *Hagood* v. *Southern*, 117 *Id.*, 52. Indeed, it being universally conceded that a State cannot be sued without its consent, * * * it is only in cases where the State is not named as a party defendant in the record, that any real question of jurisdiction can arise; for if the State is named as a party defendant in the record, that precludes further inquiry, and the court, it is universally conceded, cannot take jurisdiction. * * * The action is not brought against the defendants, as individuals, for a tort, from which they are seeking to defend themselves by some act or order of the State government, but the action is brought against them as commissioners of the sinking fund, to recover property alleged to be in their possession officially. * * * If, then, the property is

to be regarded as in the official possession of the secretary of State, held and claimed as the property of the State, and as such subject to the control of the commisioners of the sinking fund, it would seem to be clear that the action is, in fact though not in form, an action against the State itself; for, in such case, as the State can only hold possession of personal property by or through an agent, the possession of the officer or agent is the possession of the State, and the State is an indispensable party to any contest for the right of possession. Even if the possession of the State was originally acquired by some wrongful act of some of its officers or agents (though it is difficult to see how this could be judicially determined until the question of jurisdiction is first disposed of), still no action could be maintained by the rightful owner to recover possession against an officer of the State government, holding and claiming the property as the property of the State, when sued as such, because in such case the State, being the real party in interest, would be an indispensable party to the action, and as she could not be made a party without her consent, the action could not be maintained in any court, and the claimant would be remitted to his remedy by petition to the legislature, just as in the case of all other claims against the State, where, if his claim be well founded, it is not permissible to doubt he would receive ample justice. If, however, the action should be brought against the person in possession as an individual, and he in his defence seeks to justify his possession by alleging title to or right of possession in the State, then, as in the case of *U. S.* v. *Lee*, 106 U. S., 196, he must establish such title or right of possession, and, if he fails to do so, judgment goes against him as an individual. The reason for the distinction is obvious. In the former case, the party in possession being sued as an officer, judgment can only go against him as such, and not against him as an individual, and as the only property he holds as an officer is the property of the State, it is clear that the State is the real party in interest, as it is out of her property alone that the judgment sought to be recovered can be satisfied. But in the latter case, where the party in possession is sued as an individual, the judgment can only be enforced against the individual

property of the defendant, and the State is not necessarily interested, and is not, therefore, the real party in interest." The foregoing case is cited with approval in the case of *Columbia Water Power Co.* v. *Columbia etc. Light & Power Co.*, 43 S. C., 154; and see the case of *Green* v. *Niver, Ibid.*, 359, more recently decided by this court. The following authorities are cited in support of these views: *Louisiana* v. *Jumel*, 107 U. S., 711; *In re Ayers*, 123 *Id.*, 443; *Pennoyer* v. *McConnaughy*, 140 *Id.*, 1; *Reagan* v. *Trust Co.*, 154 *Id.*, 418.

There is no difference in principle whether the proceeding against the officers of the State in their representative capacity is to affect the control of the money already in the treasury or a title deed in her possession. This is an equity case, while that of *Lowry* v. *Thompson, supra,* was an action at law. There is, therefore, stronger reason for interposing objection to the jurisdiction of the court in this case than there was in that case. *Columbia Water Power Co.* v. *Columbia etc. Light & Power Co., supra.* In the case of *Louisiana* v. *Jumel*, 107 U. S., 711, Chief Justice Waite, in behalf of the court, said: "The treasurer of the State is the keeper of the treasury, and in that way is the keeper of the money collected from this tax, just as he is the keeper of other public moneys. The taxes were collected by the collectors and paid over to the State treasurer—that is to say, into the State treasury—just as other taxes were when collected. The treasurer is no more a trustee of these moneys than he is of all other public moneys. He holds them, but only as the agent of the State. If there is any trust, the State is the trustee, and unless the State can be sued, the trustee cannot be enjoined. The officers owe duty to the State alone, and have no contract relations with the bondholders. They can only act as the State directs them to act, and hold as the State allows them to hold. It was never agreed that their relations to the bondholders should be any other than as officers of the State, or that they should have any control over this fund, except to keep it, like other funds, in the treasury, and pay it out according to law. They can be moved through the State, but not the State through them.

"In this connection there is much that is instructive in the

case of *Regina* v. *Lords Com'rs, etc.*, L. R. 7 Q. B., 387. There money had been appropriated by parliament for the payment of costs of a particular character, and an application was made for a mandamus to compel the lords commissioners of the treasury to pay certain bills which had been properly taxed; but, although the court was emphatic in its declaration that payment ought to be made, the writ was refused, because the lords commissioners held the money as the servants of the crown, and no duty was imposed upon them as between them and the persons to whom the money was payable. Lord Chief Justice Cockburn, in his opinion, said (page 394): 'Though I quite agree that, according to the appropriation act, they (the lords commissioners) were bound to apply the money upon the vouchers being produced, and had no authority to retax these bills, still I cannot say that there is any duty which makes it incumbent on them to do what I cannot hesitate to say they ought to have done, except as servants of the crown; because in that character they have received the money, and in no other.' And Blackburn, J. (page 399): 'It seems to me that the obligation, such as it is, is upon her majesty, to be discharged through her servants, and you cannot proceed, therefore, against her servants.' So here the obligation is all on the State, to be discharged through its servants, and the money is held by the officers proceeded against in their character as servants of the State, and no other."

After stating the facts in the famous case of *Osborn* v. *Bank*, 9 Wheat., 738, the chief justice, in the case of *Louisiana* v. *Jumel, supra*, then said: "Under this state of facts, the order for its return involved no question of power to interfere with what was actually in the treasury. The officers stood in the place of a sheriff who had levied an execution on goods, and was sued to test his right to keep them, and the principle applied in the decision is thus stated in the head note of the report: 'A court of equity will interpose by injunction to prevent the transfer of a specific thing, which, if transferred, will be irre- trievably lost to the owner, such as negotiable stocks and securi- ties.' Thus the money seized was kept out of the treasury, because, if it got in, it would be irretrievably lost to the bank,

since the State could not be sued to recover it back. No one pretended that if money had been actually paid into the treasury, and had become mixed with the other money there, it could have been got back from the State by a suit against the officers. They would have been individually liable for the unlawful seizure and conversion, but the recovery would be against them individually for the wrongs they had personally done, and could have no effect on the money which was held by the State. Certainly, no one would ever suppose that, by a proceeding against the officers alone, they could be held as trustees for the bank, and required to set apart from the moneys in the treasury an amount equal to that which had been improperly put there, and hold it for the discharge of the liability which the State incurred by reason of the unlawful exaction."

Mr. Justice Mathews, delivering the opinion of the court in *In re Ayers*, 123 U. S., 443, uses this language: "The very object and purpose of the eleventh amendment were to prevent the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties. It was thought to be neither becoming nor convenient that the several States of the Union, invested with that large residuum of sovereignty which had not been delegated to the United States, should be summoned as defendants to answer the complaints of private persons, whether citizens of other States or aliens, or that the course of their public policy and the administration of their public affairs should be subject to, and controlled by, the mandates of judicial tribunals, without their consent and in favor of individual interests. To secure the manifest purposes of the constitutional exemption guaranteed by the eleventh amendment, requires that it should be interpreted, not literally and too narrowly, but fairly and with such breadth and largeness as effectually to accomplish the substance of its purpose. In this spirit, it must be held to cover not only suits brought against a State by name, but those also against its officers, agents, and representatives, where the State, though not named as such, is nevertheless the only real party, against which alone, in fact, the relief is asked, and against which the judgment or decree effectively operates."

We come now to a consideration of the objection, that the question as to the constitutionality of the acts cannot properly arise, as there are other grounds upon which the court can rest its judgment. In Cooley's Constitutional Limitations (159 and 160), the following language is used: "It must be evident to any one that the power to declare a legislative enactment void is one which the judge, conscious of the fallibility of the human judgment, will shrink from exercising in any case where he can conscientiously, and, with due regard to duty and official oath, decline the responsibility. The legislative and judicial are co-ordinate departments of the government, of equal dignity. Each is alike supreme in the exercise of its proper functions, and cannot, directly or indirectly, while within the limits of its authority, be subjected to the control or supervision of the other without an unwarrantable assumption by that other of power which, by the Constitution, is not conferred upon it. * * * The task is, therefore, a delicate one, and only to be entered upon with reluctance and hesitation. It is a solemn act, in any case, to declare that that body of men, to whom the people have committed the sovereign function of making the laws for the commonwealth, have deliberately disregarded the limitations imposed upon this delegated authority, and usurped power which the people have been careful to withhold; and it is almost equally so when the act which is adjudged to be unconstitutional appears to be chargeable rather to careless and improvident action, or error in judgment, than to an intentional disregard of obligation."

In the case of *Ex parte Florence Schools*, 43 S. C., 11, Chief Justice McIver, for the court, said: "We do not think that the question of the constitutionality of so much of the act of 4th January, 1894, as authorizes the board of commissioners of the Florence graded schools to assess upon each scholar supplementary tuition fees, except in certain cases, can properly be considered or determined in this proceeding, for two reasons: (1) It is a well settled and most salutary rule, that a court should never undertake to pass upon the constitutionality of an act of the legislature—an ordinate branch of the government—unless it is necessary to the determination of the case in which such

a question is presented; * * * for, as is said in Cooley's Constitutional Limitations (2d ed.), at page 163: 'Neither will a court, as a general rule, pass upon a constitutional question, and decide a statute to be invalid, unless a decision upon that very point becomes necessary to the determination of the cause. * * * In any case, therefore, where a constitutional question is raised, though it may be legitimately presented by the record, yet if the record presents some other and clear ground upon which the court may rest its judgment, and thereby render the constitutional question immaterial to the case, that course will be adopted, and the question of constitutional power will be left for consideration, until a case arises which cannot be disposed of without considering it, and when, consequently, a decision upon such question will be unavoidable.' But, in addition to this, it seems to us more than questionable whether it is competent for respondent to raise the constitutional question in this case; for, as it is said in Cooley's Constitutional Limitations, at pages 163, 164: 'Nor will a court listen to an objection made to the constitutionality of an act, by a party whose rights it does not affect, and who has, therefore, no interest in defeating it. * * * The statute is assumed to be valid until some one complains, whose rights it invades. *Prima facie*, and on the face of the act itself, nothing will generally appear to show that the act is not valid, and it is only when some person attempts to resist its operation, and calls in the aid of the judicial power to pronounce it void as to him, his property, or his rights, that the objection of unconstitutionality can be presented and sustained. Respect for the legislature, therefore, concurs with well established principles of law in the conclusion that such an act is not voidable only; and it follows, as a necessary legal inference from this position, that this ground of avoidance can be taken advantage of by those only who have a right to question the validity of the act, and not by strangers.' In this case, it appears that petitioners are doing nothing more than what they are expressly authorized to do by the sixth section of the act of 4th January, 1894, * * * and if it is claimed that such provision is unconstitutional, and invades or infringes upon the constitutional

rights of any citizen, it is for such citizen to raise the question by some proper proceeding against the petitioners, and not for the respondent, whose constitutional rights, so far as we can discover from anything appearing in this case, have neither been invaded nor infringed upon by said act or the action of the petitioner thereunder."

We will now consider the fourth objection, which is as follows: If the State could be sued, she would be estopped from interposing the objection that the services rendered at her instance and for her benefit were illegal. The appropriations show that the State desires the payment of such services. Equity will not, therefore, lend its aid to compel the State indirectly, through the defendants as her fiscal officers, to do that which the State could not be compelled to do in a direct proceeding. In support of this objection we quote from Cooley's Constitutional Limitations, page 488: "It must always be conceded that the proper authority to determine what should and what should not properly constitute a public burden, is the legislative department of the State. * * * And in determining this question the legislature cannot be held to any narrow or technical rule. Certain expenditures are not only necessary to the continued existence of the government, but as a matter of policy it may sometimes be proper and wise to assume other burdens which rest entirely on considerations of honor, gratitude or charity. The officers of government must be paid, the laws printed, roads constructed, and public buildings erected; but, with a view to the general well-being of society, it may also be important that the children of the State should be educated, the poor kept from starvation, losses in the public service indemnified, and incentives held out to faithful and fearless discharge of duty in the future by the payment of pensions to those who have been faithful public servants in the past. There will, therefore, be necessary expenditures, and expenditures which rest upon consideration of policy alone, and in regard to the one as much as the other, the decision of that department to which alone questions of State policy are addressed must be accepted as conclusive." See, also, *State* v. *Whitesides,* 30 S. C., 585.

The acts of the legislature making appropriations for the payment of services performed by the supervisors of registration are separate and distinct from the registration acts, and the legality of the acts making such appropriations does not depend upon the constitutionality of the registration acts. Time and again the legislature has made appropriations for the payment of services which had not been performed, as when an officer dies before the expiration of his term of office. In the case of *Daniels* v. *Tearney,* 102 U. S., 415, the court says: "It is well settled as a general proposition, subject to certain exceptions not necessary to be here noted, that where a party has availed himself for his benefit of an unconstitutional law, he cannot, in a subsequent litigation with others not in that position, aver its unconstitutionality as a defence, although such unconstitutionality may have been pronounced by a competent judicial tribunal in another suit. In such cases the principle of estoppel applies with full force and conclusive effect." * * * In the case first cited, an injunction was applied for, to prevent the collection of a tax authorized by an act of the legislature, passed during the late civil war, to enable the people of a county to raise volunteers and thus avoid a draft for soldiers, and that object had been accomplished. In disposing of the case, the court well asked: "Upon what principle of exalted equity shall a man be permitted to receive a valuable consideration through a statute, procured by his own consent or subsequently sanctioned by him, or from which he derived an interest and consideration, and then keep the consideration and repudiate the statute?" See, also, *Tompkins* v. *Railroad Co.,* 21 Fed. Rep., 382.

It is the judgment of this court, that the petition be dismissed.

MR. JUSTICE POPE. This is an application to this court, in its original jurisdiction, for a writ of injunction, whereby the respondents, as State officers, shall be perpetually enjoined from paying to the supervisors of registration in each county of this State their respective salaries, provided for them in the act of the General Assembly of this State making appropriations to be paid to such officers for their services as such during the fiscal year beginning on the 1st day of November, 1893, and

ending on the 31st day of October, 1894, and also from paying
to the messengers of elections, commissioners of elections, and
managers and clerks of elections in this State, the amounts ap-
propriated under the same act for such purposes and for the
same fiscal year. A preliminary restraining order was granted
by this court, on the 26th November, 1894, forbidding the
comptroller general from drawing his warrrnts on the State
treasurer, and likewise the State treasurer from paying any
warrants drawn by the comptroller general upon such State
treasurer, in favor of any supervisor of registration in this State
for services rendered during the fiscal year beginning 1st No-
vember, 1893, and ending on the 31st of October, 1894. The
grounds upon which the petitioner based his application for
the remedy invoked were that the act of the General Assembly
of this State, whereby a registration of the voters of this State
should be made by such supervisors of election, was in sundry
particulars in violation of the Constitution of this State, as
well as that of the United States, and that such violations were
so interwoven with all the other provisions of said act for reg-
istration of voters that the whole act was void, and, being void,
such salaries were illegal, and the payment thereof should be
enjoined.

In order to insure accuracy in our statements of the plead-
ings, we will reproduce the allegations of the pleadings both as
to parties and facts. The petitioner is M. C. Butler, who sets
out in his petition that he is a citizen and resident taxpayer of
the county of Edgefield, in the State aforesaid, possessing all
the qualifications and laboring under none of the disqualifica-
tions provided in the Constitution and laws of this State for the
electors and officeholders thereof, and this action is brought
"on behalf of himself and others, citizens and resident tax-
payers of said State, in the like plight and condition as himself
as to qualifications and disqualifications, too numerous to be
made parties to this action, and of others, citizen and resident
taxpayers of said State, possessing the same constitutional
qualifications as himself, and laboring under no disqualifica-
tions save those imposed by the acts of assembly hereinafter
mentioned, alleged hereinafter to have been enacted in viola-

tion of the said Constitution." The petitioner next alleges that William H. Ellerbe and William T. C. Bates are now, and have been for some time last past, the former the comptroller general and the latter the treasurer of the State of South Carolina.

The petitioner, in the third paragraph of his petition, alleges "that on the 9th day of February, A. D. 1882, there was enacted by the General Assembly of this State, and approved by the governor thereof, an act entitled 'An act to amend title 2, entitiled 'Of Elections,' of part I., entitled 'Of the Internal Administration of the Government,' of the General Statutes, which has been incorporated into the General Statutes of South Carolina of 1882, and the Revised Statutes of South Carolina, approved by the General Assembly of 1893. That section 2 of said act is in these words: 'All electors of the State shall be registered as hereinafter provided; and no person shall be allowed to vote at any election hereafter to be held unless registered as herein required.' The corresponding section of the General Statutes of 1882 is 890, and the corresponding section of the Revised Statutes of 1893 is 132. And that section 5 of said act provides (as does also the corresponding section 93 of the General Statutes of 1882) that, in the months of May and June, 1882, the supervisors of registration should make a full and complete registration of all qualified voters in the manner therein prescibed."

The petitioner, in the fourth paragraph of his petition, alleges: "That section 6 of said act provides (as does the corresponding section 94 of the General Statutes of 1882): 'When the said registration shall have been completed, the books shall be closed, and not reopened for registration, except for the purposes and as hereinafter mentioned, until after the next general election for State officers. After the said next general election the said books shall be reopened for registration of such persons as shall thereafter become entitled to registration, on the first Monday in each month, to and until the first Monday of July, inclusive, preceding the following general election, upon which last named day the same shall be closed, and not reopened for registration until after the said general election; and ever after the said books shall be opened for registration of such electors

on the days above mentioned, until the first day of July preceding a general election, when the same shall be closed as aforesaid, until the general election shall have taken place."

The petitioner, in the fifth paragraph of his petition, alleges: "That section 9 of said act provides (as does, also, the corresponding section 97 of the General Statutes of 1882), that any person coming of age, and becoming qualified as an elector, may appear before the supervisor of registration, on any day on which the books are opened as aforesaid, and take oath as to his age and qualifications as hereinbefore provided, and if the supervisor finds he is qualified, he shall enter his name upon the registration book of the precinct wherein he resides. The corresponding section of the Revised Statutes of 1893 is 140."

The petitioner, in the sixth paragraph of his petition, alleges: "That section 10 of said act provides that each elector registered shall be furnished with a certificate by the supervisor, and that no person shall be allowed to vote at any other precinct than the one for which he is registered, nor unless he produces and exhibits to the managers of election such certificate. The corresponding section of the General Statutes of 1882 is 98; of the Revised Statutes of 1893 is 142."

The petitioner, in the seventh paragraph of his petition, alleges: "That section 12 of said act is: 'In the case of removal of an elector from one residence to another in the same precinct, such elector shall notify the supervisor of registration, and shall surrender his certificate of registration to the said supervisor of registration, who shall enter the fact upon the registration book, and shall give such elector a new certificate in accordance with such change of residence.' The corresponding section of General Statutes of 1882 is 100; of Revised Statutes of 1893 is 146. And that section 15 of said act is: 'No elector moving from one residence, precinct, parish, ward, or county to another, shall be allowed to register or vote without a transfer of registration as above provided.' The corresponding section of General Statutes of 1882 is section 103; of Revised Statutes of 1893 is section 149."

The petitioner, in the ninth paragraph of his petition, alleges:

"That the aforesaid provisions and sections of said act, and section 16 thereof, and divers others of said act, are in violation of the following sections: 14, 21, 34, 36, and 41 of article 1, and sections 2, 8, and 10 of article 2, and of section 10 of article 8 of the Constitution of this State, and section 2 of article 1, article 10 of the amendments, and section 1 of article 14, and section 1 of article 15 of amendments of the Constitution of the United States of America, and divers other sections of the latter Constitution, and are such essential and main features of said act, and so interwoven with its letter and spirit, as to make said act not a reasonable, uniform, and impartial regulation of the electoral franchise, but a denial and abridgement of the constitutional right of the citizen to vote, an impediment, hindrance, and obstruction of the exercise of that right, and so utterly subversive of the constitutional provisions in regard to elections by the people as to render the entire act unconstitutional, null, and void."

The petitioner, in the tenth paragraph of his petition, alleges: "That by an act of the General Assembly of this State, approved December 23, 1893, entitled 'An act to make appropriations to meet the ordinary expenses of the State government for the fiscal year commencing November 1, 1893,' there was appropriated, by the ninth subdivision of section 9 thereof, for the salaries of the supervisors of registration, $7,050; that is to say, to pay the supervisors of registration for each county in the State, except Charleston County, the sum of $200 for the services to be rendered during the fiscal year commencing November 1, 1893, and to the supervisor of registration for Charleston County the sum of $250, for services to be rendered during the same period; said amounts to be paid, one-half on the 1st day of June, 1894, and the remaining one-half on the 1st day of November, 1894, out of any money in the treasury not otherwise appropriated. And there was appropriated by the eighteenth subdivision of said section 9 of said act, 'for the pay of messengers of election, $1,200; and by the twenty-first subdivision of said section, 'for the pay of commissioners and managers of election, $15,000; to pay for advertising notices of election, $2,000.' And your petitioner avers, on information

18—44

and belief, that portions of said appropriations are still in the treasury, undrawn and unpaid, as is also a portion of a previous appropriation for payment of supervisors of registration; that by reason of the premises, these appropriations are made for compensation for the performance of illegal and unconstitutional services, and are *ultra vires* on the part of the General Assembly, and illegal, unconstitutional, null, and void, and it is illegal and violative of the said Constitutions for the comptroller general of the State to draw his warrant upon the State treasurer for payment of said appropriations, or for the said treasurer to pay them."

The petitioner, in the eleventh paragraph of his petition, alleges: "That notwithstanding the premises, the said William H. Ellerbe, comptroller general of said State, has heretofore unlawfully drawn, and is now unlawfully drawing, and intends to continue in future to unlawfully draw, warrants upon the said William T. C. Bates, treasurer of said State, for the payment of said appropriations, and that the said treasurer, William T. C. Bates, has heretofore unlawfully paid, is now unlawfully paying, and intends in future to unlawfully pay, all such warrants so drawn or to be drawn by said comptroller general for payment of said appropriations."

And the twelfth paragraph of petitioner's petition alleges: "And your petitioner further shows, that the foregoing has worked, and will work, manifest wrong and irreparable injury to your petitioner and other citizens and resident taxpayers of the State of South Carolina, unless restrained by this court, and that he and they are without adequate remedy at law in this behalf.

"Wherefore, your petitioner prays that said sections of said act, and the entire act, as it appears in the acts of 1882, in the General Statutes of 1882, and the Revised Statutes of 1893, be declared unconstitutional, null, and void; that defendants be restrained from any further violation of the rights of your petitioner; and that this court grant its writ of injunction, issuing out of and under the seal of this honorable court, perpetually enjoining the defendants, their clerks, agents, servants, or attorneys, to wit: William H. Ellerbe, said comptroller general,

from drawing any warrants upon the said treasurer for the payment of any amount of said appropriations, and William T. C. Bates, said treasurer, from making any payment of any of said warrants drawn or to be drawn. And your petitioner prays for such other and further relief as to this honorable court may seem meet and proper."

By the order of this court, passed on the 3d of December, 1894, the Honorable James Norton, as the successor in office of the Honorable William H. Ellerbe, as comptroller general of this State, was, by his consent, substituted as a defendant or respondent herein.

The return of the comptroller general and treasurer was on that day submitted to this court, and by its terms it denies petitioner's right to maintain this proceeding, and also denies that the act of 9th of February, 1882, is unconstitutional, in whole or in part, and also denies that the petitioner has correctly set forth the provisions of said act in his petition herein; and further avers that the petitioner is estopped from raising this question as to the constitutionality of the registration laws of this State, because he has been twice elected to the United States Senate by the General Assembly of this State, whose members were all elected by and under the registration laws of this commonwealth, receiving as his salary the sum of $6,000, and has not returned, or offered to return, one dollar of this salary before he brought this action.

I am unable to agree with my brethren, and hence this separate opinion. The delay in rendering the judgment of this court is owing to my failure to prepare this separate opinion at an earlier day. Let it be understood, however, that when a grave constitutional question is to be passed upon, unless it is imperatively necessary that there shall be no delay, I am disposed to view it as my duty to pause and consider thoroughly what is presented. All respectable authority in this country agrees that there can be no graver demand made upon the Supreme Court of the general government or of the State government, respectively, than to pass upon the action of a co-ordinate branch of the government, when such action is alleged to be in violation of the Constitution of one or both. Primarily the

court should see that it possesses jurisdiction in such special
instance.   This is absolutely necessary; for, if a court passes
upon a contest in which it has no jurisdiction, its judgment is
a nullity.

I said I could not agree with my brethren.   Let me explain.
CHIEF JUSTICE McIVER has prepared an opinion in which he
reaches the conclusion that the entire act in question is uncon-
stitutional, but he does not pass upon but one phase of the
question of jurisdiction.   If this court is without jurisdiction
to hear and determine these issues here presented, involving
as they do questions of constitutional law, his error is potent.
ASSOCIATE JUSTICE GARY, however, believing that the action
is without equity, etc., concludes that the proceeding should be
dismissed.   I agree with him that the proceeding should be
dismissed.   But I am unwilling to base such a conclusion
upon the views he presents with rare ability, that this is
virtually an action against the State, and that, inasmuch
as the State cannot be sued without her consent, which latter
she has not given, the proceeding by plaintiff should be dis-
missed.

I cannot agree that this is an action against the State.   In
my judgment, a citizen taxpayer, if he has sufficient equities
therefor, can assail the action of either State or municipal
officers, if they are proceeding to dispose of public property,
including public money, under an act that is unconstitutional.
Otherwise, I fail to see where the citizen is completely protected
in his rights.   I know that MR. JUSTICE GARY points to the
case of *Lowry* v. *Thompson*, 25 S. C., 416, as a case in point.
But twice in the year 1893, at a grave exigency, this court as-
serted its right in equity to grant relief to the citizen, if he
could show himself entitled thereto.   I refer to the cases of
*Evans* v. *Tillman*, 38 S. C., 238, and *Robertson* v. *Tillman*, 39 S.
C., 298, in regard to the $5,250,000 of State bonds then in pro-
cess of being issued to redeem the State bonds which would
mature on the 1st July, 1893.   In each of those cases an in-
junction was prayed for.   This relief was denied, not upon any
question of jurisdiction, but because, upon the merits disclosed
at the hearing, the petitioner in each case was found not to be

entitled to the writ of injunction prayed for. Other cases might be cited on the same line, in this State and from other States. As I have already stated, in my view, the recognition of this right of a citizen or citizens to invoke the power of the Court of Equity to prevent the despoliation of his property by officers acting under an illegal, because unconstitutional, act of the General Assembly, is necessary to his complete protection, a right guaranteed to him in and under the organic law of the State and general governments. Hence, I announce myself as unable to agree to so much of the opinion of MR. JUSTICE GARY as contravenes this doctrine.

I have taken the pains to copy into my opinion the exact paragraphs of the plaintiff's complaint, in order that it may be seen at a glance, that any references by me to the complaint are fully supported by the text. First and foremost, I wish to call attention to the fact that the plaintiff has not reproduced the text of the act in question, so far as some of its provisions are concerned, when he quotes the same in his complaint. For instance, take section 5 of the act of February, 1882. Here is that section in its integrity: "After the approval of the act, the supervisor of registration, in the months of May and June next, *shall make a full and complete registration of all qualified voters* in the following manner: He shall give three weeks' notice of the time and place of registration by advertising in one or more county papers, or by posting in a public place in each voting precint where no paper is published in the county. The time for registration shall not be less than one nor more than three days at each registration precinct. Immediately after the closing of the registration at the precincts, he shall open his books at the county seat to correct errors in registration, *and to register such electors who failed to register at their respective precincts and who shall then and there present themselves for that purpose, entering the names of such voters in his book for their proper precincts.* At the conclusion of the registration hereinbefore provided for, *the supervisor of registration shall revise the list, and in case it be made to appear to his satisfaction that there is a qualified voter in a precinct who has failed to register, he may, upon such evidence as he may think necessary, in his discretion,*

*permit the name of such voter to be placed on said list and issue a cer-tificate therefor.* That for the purpose of registration, each township as now laid out and defined be, and is hereby, declared a registration precinct, and in those counties in which there are no such townships, that the parish as formerly known and defined be, and is hereby, declared such precinct, and in the cities of Columbia and Charleston each ward shall be a registration precinct" [italics mine].

Thus it is made manifest that, by the express terms of this act, every voter who possesses the constitutional qualifications is declared to be entitled to registration; that the supervisor of registration is imperatively commanded to register each of such voters, and, to enable him to do so, he is required to give public notice of the time and place of registration for three weeks in one or more county newspapers, or, if none such, by posting notices in the precincts; then, first, he is to keep his books open for such registration from one to three days at each precinct, and, second, thereafter, at the county seat, he is required to register such as failed to register at their respective precincts, and, third, thereafter any voter's name may be entered upon such books upon proper notice. But these are not all of the provisions in behalf of the voters entitled, in May and June of 1882, to be registered. Upon a demand by one entitled to be registered, if the supervisor refuses for any cause to do so, an appeal is provided to a board of supervisors, composed of the supervisor himself and two assistant supervisors, who are required to pass upon the voter's right to be registered, and if the decision of this board is adverse to the voter, such voter may apply by appeal therefrom to a Circuit Judge. See section 3 and also section 8 of the act of 1882.

Let it be borne in mind that this system of registration is believed to be peculiar to this State, and is an innovation upon the old plans for that purpose. In other States, registration is a temporary arrangement, and dependence for the enforcement of such provisions is had to temporary boards appointed for that purpose. With us, the supervisors of registration are regularly appointed officers, whose services extend throughout the year, and from year to year. It is a salaried office. The two assistant

supervisors for each county are also appointed by the governor, and are also commissioned officers. The provisions of this act also supply the machinery for the registration of all those who attain the full age of twenty-one after May and June, 1882, and also of all those who shall move into the State after the months of May and June, 1882. See sections 6, 8, 9, and 10, as well as last subdivision of section 3.

Now, where is there any allegation in the complaint here in question, that any one or more citizens of this State, whether white or black, or colored, has or have been deprived of their right to vote, by or under any one or more of the provisions of the registration laws of this State? I challenge any one to point out one or more instances, set out in the complaint, of a practical denial of the right of suffrage in this State, under the enforcement of our registration laws, whose constitutionality is here assailed. The only paragraph of the complaint that even squints at any such allegation is the ninth, wherein, by a reference to the text of such paragraph hereinbefore quoted, it is asserted that certain sections of the registration law are contrary, in letter and spirit, to certain sections of the Constitution of this State and that of the United States. Then follows this language: "And are such essential and main features of said act, and so interwoven with its letter and spirit, as to make said act not a reasonable, uniform, and impartial regulation of the electoral franchise, but a denial and abridgement of the constitutional right of the citizen to vote, an impediment, hindrance, and obstruction of the exercise of that right, and so utterly subversive of the constitutional provisions in regard to elections by the people, as to render the entire act unconstitutional, null, and void."

It must be obvious to every thoughtful mind that, in the quotation just made, there is an entire absence of any charge that any elector, who was of full age in May or June, 1882, or who has since attained his full age, or who has since removed from another State to this State, all or any of whom were possessed of all the constitutional rights to vote, has been denied his right to vote at elections in this State. From the beginning to the end of the complaint here being considered, there is an

entire absence of the charge, that the petitioner or plaintiff is not duly registered as a voter. Can the existence of a statute on our statute book, alleged to be contrary to the State or Federal Constitution, furnish any justification to a court of equity, or any other court, for entering upon a consideration of such questions, unless such alleged unconstitutional legislation is set out in the pleadings, as affecting the rights of some citizen or class of citizens? To state the question, is to answer it. Certainly this court has not been slow in announcing, in positive terms, that it will not engage in the discussion and decision of abstract questions of law, which have no reference to, or are not based upon, a concrete case before us. *State v. Gathers,* 15 S. C., 370, and several cases since that case was decided, which hold the same views. It must be patent to every one that this is an effort to place upon this court a political duty—to have this court pass upon the labors of a co-ordinate branch of the government, set up by the people of this State. I admit it is the duty of this court to do so, when a citizen or citizens have their rights invaded by a statute that is unconstitutional, but I deny that it is the duty of this court in an equity suit, when the question as presented is an abstract principle of law.

Besides all this, it is an admitted principle in our jurisprudence, and the same principle is enforced in the courts of equity of the United States, that when there is a plain and adequate remedy at law, there is no jurisdiction in equity. As was well said by the late Chief Justice Dunkin, in the case of *Eno* v. *Calder*, 14 Rich. Eq., 154: "It is an original principle in the administration of equity jurisprudence, that the aid of the court cannot be successfully invoked, when adequate relief may be afforded in the ordinary forum. But the legislature of South Carolina has not thought proper to leave this to inference, or to the authority of usage, which might be changed by the court. It was, therefore, provided by the act of the assembly, that suits in equity should not be maintained where the party had a plain and adequate remedy at law." To the same effect, and in express recognition of the authority of this case just cited, and this, too, since the adoption of our

present Constitution, Mr. Justice Willard, in *Hall* v. *Joiner &
McCallister*, 1 S. C., 190, said: "In this State the exclusion of
courts of equity from jurisdiction in cases in which an adequate
remedy is conferred at law, rests on the statute." * * * In the
case at bar the plaintiff seeks in equity to enjoin the payment
of salaries to certain officers of the State, because he says the
officers in question are created by a statute of the State which
is unconstitutional. In other words, these supervisors of regis-
tration are attempting to exercise the duties of, and receive
compensation for, public offices that do not exist, because the
legislation providing the same is unconstitutional. Is there
not a plain remedy at law to test the terms of office? Certainly
there is. Is there not a plain and adequate remedy of a tax-
payer to test the constitutionality of any tax imposed by the
General Assembly? Instead of one, there are at least two.
If this court is without jurisdiction in the premises, this
should be the end of the matter.

The judgment of this court is, that the petitioner or plaintiff
is not entitled to the relief prayed for, and that the petition or
complaint be and is hereby dismissed.

MR. CHIEF JUSTICE McIVER, *dissenting.* This is an action,
instituted in the original jurisdiction of this court, for an in-
junction restraining the defendants, as fiscal officers of the
State government, from applying the public funds in the State
treasury to the payment of certain appropriations, which, it is
claimed, have been illegally made by the legislature. The
particular appropriations claimed to be illegal are those made
in the appropriation act of 23d December, 1893, for the pay of
supervisors of registration, and for the pay of commissioners,
managers, and messengers of elections, for the fiscal year com-
mencing 1st November, 1893; and the prayer of the complaint
is that the defendant, Ellerbe, and his successors in office, as
comptroller general of the State of South Carolina, be perpet-
ually enjoined from drawing any warrant on the State treasurer
for the payment of any of the said appropriations, and that the
said Bates, and his successors in office, as treasurer of the said
State, be perpetually enjoined from paying any of the said

warrants.   The ground upon which this claim is based is that the registration law, as it may be briefly.termed for convenience, is unconstitutional, null, and void, and any appropriations of the public funds in pursuance of any of its provisions are without constitutional authority, and should be prohibited.

Inasmuch as a copy of the complaint, or petition,[1] as it is styled, should be incorporated in the report of this case, we do not deem it necessary to make here any more detailed or particular statement of the nature and scope of the action than has been made in general terms above, except to say that the action is brought by the plaintiff as "a citizen and resident taxpayer of the county of Edgefield, State aforesaid, possessing all the qualifications and laboring under none of the disqualifications provided in the Constitution and laws of this State for the electors and officeholders thereof, on behalf of himself and other citizens and resident taxpayers of said State in the like plight and condition as himself as to the qualifications and disqualifications, too numerous to be made parties to this action, and of other citizens and resident taxpayers of said State possessing the same qualifications as himself, and laboring under no disqualifications save those imposed by the acts of assembly hereinafter mentioned, alleged hereinafter to have been enacted in violation of the said Constitution."   The main object of the action, unquestionably, is to test the constitutionality of the registration laws of this State.

But, before proceeding to the discussion of this main question in the case, it is necessary, first, to dispose of two preliminary objections presented by the attorney general.   The first of these objections, as we understand it, is that such an action as this cannot be brought by a single taxpayer, either on his own behalf or on behalf of himself and others in similar plight and condition, upon the ground that no one can be allowed to assail the constitutionality of an act of the legislature by an action, unless he shows that he has been injured either in his rights of person or property by such act, or, to use the language of the attorney general in his argument, "The validity of a statute cannot be questioned on the application of a mere volunteer,

---

[1] It will be found in the separate opinion of Mr. Justice Pope.—REPORTER.

or person whose right it does not specially affect." Inasmuch as the object of this action is to prevent the application of the public funds in the State treasury, arising from taxation, in which every taxpayer has a direct interest, to an illegal purpose, it would seem clear that there is no foundation for the objection. But we do not deem it necessary to discuss the question, for we think it has been determined by express adjudication in this State in at least two cases, *Mauldin* v. *City Council*, 33 S. C.,1, and *McCullough* v. *Brown*, 41 *Id.*, 220, supported by numerous authorities elsewhere. 1 Pom. Eq. Jur., p. 277, § 260; Cool. Tax., 764; 2 Dill. Mun. Corp., § 736, and cases cited in note; *Crampton* v. *Zabriskie*, 101 U. S., at page 609, where Mr. Justice Field used this language: "Of the right of resident taxpayers to invoke the interposition of a court of equity to prevent an illegal disposition of the moneys of the county * * * there is at this day no serious question." While it is true that the case of *McCullough* v. *Brown, supra*, has been overruled in so far as it held the dispensary law unconstitutional, by the subsequent case of *State ex rel. George* v. *Aiken*, 42 *Id.*, 222, yet that case does not affect the point for which the case of *McCullough* v. *Brown* is now cited, for that point was in no way alluded to in the Aiken case, and it is there stated that the case of *McCullough* v. *Brown*, and those decided upon its authority, "are overruled *in so far as they are antagonistic to the principles upon which this case is decided*" [italics ours].

The next preliminary objection is that the plaintiff herein is estopped from assailing the constitutionality of the registration law by reason of the fact that he has for many years been in the enjoyment of the emoluments and honors of an office to which he has been chosen by elections held under the provisions of the registration law. How this can affect the right of the plaintiff, as a taxpayer, to institute an action to prevent the application of the public funds arising from taxation, in which he as well as any other taxpayer is interested, to an illegal purpose, it is impossible to conceive. The question here is not as to the validity of any election held under the registration law, for the record presents no such facts, and no proper parties for the consideration of any such question. The sole ques-

tion here is whether the fiscal officers of the State government shall be restrained from applying the public funds to an illegal purpose; and that question turns entirely upon the result of the inquiry whether the registration law, in pursuance of which such application is threatened to be made, violates the Constitution of the State. If it does, then, of course, it is null and void, and any appropriation of the public funds in pursuance of its provisions would be illegal, and should be restrained. We see no ground whatever for the estoppel claimed.

Coming, then, to the main question in the case, we find that the question of the constitutionality of a statute requiring the registration of voters has been very frequently before the courts of the several States, and it seems to be settled that even in States whose Constitutions are silent upon the subject, a statute requiring a registration of voters is not, *per se*, unconstitutional, as such a statute is regarded as a mere regulation of the constitutional right to vote, and is designed to furnish evidence of the fact, that the voter is possessed of the qualifications fixed by the Constitution. But it seems to be as well settled, that where the purport and effect of a registration law is to add to or to take away any of the qualifications prescribed by the Constitution, or where its effect is to obstruct, subvert, or even unnecessarily to impede, the exercise of the right conferred by the Constitution, it cannot be sustained, but must be held an unconstitutional invasion of the constitutional right of suffrage. These views are fully supported by the authorities elsewhere (for, so far as we are informed, we have no case in this State upon the subject), which, though not binding on us, are recommended to our approval by the reasoning upon which they are founded, as well as by the high character of the courts from which they come. See *Capen* v. *Foster*, 12 Pick., 485, reported, also, with elaborate notes in 23 Am. Dec., 632, frequently referred to as the leading case upon the subject.

In *Kinneen* v. *Wells*, 144 Mass., 497, the question was as to the constitutionality of the registration law of that State, containing a provision forbidding any naturalized person to be registered as a voter within thirty days after his naturalization, and it was held that such provision was unconstitutional, be-

cause it purported to add to the qualifications of a voter as fixed
by the Constitution the further qualification, that such voter
should be possessed of the qualifications named in the Consti-
tution for a period of thirty days before he could be registered
as a qualified voter. The court, after noticing the further ob-
jection, that such a provision was unconstitutional, because it
was not impartial, inasmuch as it imposed a restriction upon a
certain class of voters—naturalized persons—not imposed upon
any other class, goes on to say that, even if the provision were
general in its character, applying alike to all classes of voters,
it would still be unconstitutional, because it added to the quali-
fications of a voter, as fixed in the Constitution, the further
requirement, that he should be possessed of such qualifications
for a specified time before he offers himself for registration;
whereas every person who is possessed of the necessary quali-
fications at the time he offers himself for registration, is entitled
to be registered, without any regard to the length of time he
has been possessed of the necessary qualifications. In deliver-
ing the opinion of the court, Devens, J., uses this language:
"It is not an unreasonable provision that all persons entitled
as voters shall be registered as such previously to depositing
their ballots, and if the legislature deems that such an inquiry
could not proceed concurrently with the actual voting or elec-
tion, and both be conducted in a deliberate and orderly man-
ner, it is not unreasonable that it should provide that such an
inquiry should terminate before the election actually commences
at a previous time sufficiently long to make proper preparations
therefor." Again, after referring to *Capen* v. *Foster, supra,* as
a leading case on the subject, he says: "But, while it is held to
be within the proper limits of legislative power to provide suit-
able regulations for exercising the right of suffrage in a prompt
and orderly and convenient manner, the court, speaking through
Chief Justice Shaw, was careful to add: 'Such a construction
would afford no warrant for such an exercise of legislative
power as, under the pretence and color of regulating, should
subvert or injuriously restrain the right itself.' " And again
he says: "Every system of registration of voters contemplates ·
that the registration will be completed and that the lists of

voters will be prepared before voting actually commences. No system would be just that did not extend the time of registration up to a time as near that of actually depositing the votes as would be consistent with the necessary preparation for conducting the election in an orderly manner, and with a reasonable scrutiny of the correctness of the list."

In the case of *City of Owensboro* v. *Hickman* (Ky.), 14 S. W., 688, the registration law there considered provided for a registration of voters in the city of Owensboro, to be made on the first Monday in July and the two succeeding days, at which those only could be registered who would be entitled to vote at the August election ensuing, and also provided that no vote shall be received at any election held within a year unless the voter's name is on the registry made in July. *Held*, that the act was not a reasonable regulation of the elective franchise, and was void under the Constitution of Kentucky, providing that every male citizen, twenty-one years of age, who had resided in the State two years, and in the county, town, or city one year next preceding the election, shall be a voter. In that case the court, while conceding the power of the legislature to enact a uniform and reasonable registration law, used this language: "The true theory upon which those laws are based is, that they must not impair or abridge the elector's privilege, but merely regulate its exercise by requiring evidence of the right. The right cannot be impaired, but it may be regulated. * * * A registration law, however, will not be held valid which, under the color of regulating the manner of voting, really subverts the right." Without quoting from or referring more particularly to the cases on the subject, we think the foregoing views will be found to be supported by numerous other cases which we have examined, and to which we will simply refer by their titles: *Dells* v. *Kennedy*, 49 Wisc., 560; *Daggett* v. *Hudson*, 3 N. E. Rep., 546; *Brooks* v. *Hydorn*, 43 N. W. Rep., 1122; *Attorney General* v. *City of Detroit*, 44 *Id.*, 388; *Page* v. *Allen*, 58 Pa. St., 338; *Patterson* v. *Barlow*, 60 *Id.*, 75; *State* v. *Baker*, 38 Wisc., 71; *Edmonds* v. *Banbury*, 28 Iowa, 267; *Perry* v. *Whitaker*, 71 N. C., 475; *People* v. *Canaday*, 73 *Id.*, 198; *Monroe* v. *Collins*, 17 Ohio St., 686.

In the light of these principles, we will proceed to an examination of the provisions of the registration law of this State, with a view to ascertain whether any of the provisions of that law are in conflict with any of the provisions of our Constitution. For this purpose we will first inquire what are the provisions of the Constitution in reference to the right of suffrage. In article I., § 31, the provision is as follows: "All elections shall be free and open, and every inhabitant of this commonwealth possessing the qualifications provided for in this Constitution, shall have an equal right to elect officers, and be elected to fill public office." Section 33 of article I. provides as follows: "The right of suffrage shall be protected by laws regulating elections, and prohibiting, under adequate penalties, all undue influences from power, bribery, tumult or improper conduct." In article VIII., § 2, the qualifications of electors are specifically declared as follows: (1) He must be a male citizen who has attained the age of twenty-one years; (2) he must have resided one year in the State, and in the county in which he offers to vote sixty days, next preceding any election; (3) he must not be laboring under any of the disabilities named in the Constitution. In addition to the qualifications of a voter thus specifically declared, it is expressly provided that every person possessed of these qualifications "shall be entitled to vote for all officers that are now or hereafter may be elected by the people, and upon all questions submitted to the electors at any elections." But, in addition to this, in section 8 of the same article, it is expressly declared that the General Assembly "shall never pass any law that will deprive any of the citizens of this State of the right of suffrage, except for treason," and other offences named in the section, "whereof the person shall have been duly tried and convicted." The provision of section 3 of article VIII. is as follows: "It shall be the duty of the General Assembly to provide from time to time for the registration of all electors."

The original provisions for the registration of voters will be found in an act approved 9th of February, 1882 (17 Stat., 1110), and these provisions are incorporated in Gen. Stat. (1882), beginning with section 89 and ending with section 106; and such

provisions, as subsequently amended, are incorporated in the Revised Statutes of 1893 as sections 131–156, both inclusive. From a careful examination of the various statutory provisions thus referred to, it seems to us that the manifest scope and intent of such legislation was that there should be but one general registration of voters, to wit: that provided for in 1882, and that when the registration books were closed for that year, a person who was then a qualified voter, but who had failed from any cause, whether from sickness, absence or other cause, to register, was ever thereafter deprived of his right of suffrage, for there is no provision by which such person could afterwards be allowed to register; and section 132 of the Revised Statutes expressly declares that "no person shall be allowed to vote at any election hereafter to be held unless he shall have been heretofore registered in conformity with the requirements of chapter 7 of the General Statutes of 1882, and acts amendatory thereof, or shall be registered as herein required."

Now, on turning to the chapter of the General Statutes of 1882 and the acts amendatory thereof, we find that while provision is made in section 94 of that chapter, corresponding with section 137 of the Revised Statutes, for opening the books of registration after every general election, not, however, for the purpose of registering voters generally, but "for registration of *such persons* as shall thereafter become entitled to register" [italics ours], there is no provision for the registration of persons who had previously become entitled to register. Hence, it follows, necessarily, that one who had been a qualified voter, and, as such, entitled to register before such general election, could not then avail himself of the privilege offered by that section. The language found in section 94 of the General Statutes of 1882 is stronger than that found in section 137 of the Revised Statutes, from which we have quoted, for in the General Statutes of 1882 the language is prohibitory, and forbids the reopening the registration books, except for the purpose of registration of such persons as shall become entitled to register after the next election; and even as to this privileged class, their day of grace expires on the first day of July preceding a general election—something over four months before the gen-

eral election, which is fixed by law for the first Tuesday after the first Monday in November in every second year, reckoning from the year 1870. Const., art. II., § 11; Rev. St., § 162. It is true, also, that sections 96 and 97 of the General Statutes of 1882, as well as the corresponding sections of the Revised Statutes (140 and 141), do make special provisions for a certain class of voters, to wit: minors who come of age and are otherwise qualified, but this provision is confined to that particular class, and is, therefore, not an impartial provision.

It seems to us that this feature of the registration law, to say nothing of other constitutional objections, renders it obnoxious to that provision of the Constitution above quoted, which makes it the duty of the General Assembly to provide from time to time for the registration of all electors. The language of that constitutional provision necessarily implies that its purpose was to require the General Assembly to provide every facility for the registration of all electors, by providing for the registration of all electors "from time to time," so that, as far as practicable, no elector should be deprived of his right of suffrage, and that this law, which provided for one general registration more than ten years ago, and afforded no other opportunity to any elector, except those of a certain class, to comply with its provisions, even though his failure to avail himself of the first and only opportunity ever offered him to register resulted from sickness, absence, or other good cause, must be regarded as a violation both of the spirit and letter of the Constitution.

Inasmuch as the right of suffrage is provided for and guaranteed by the Constitution, and the General Assembly is expressly forbidden from passing any law depriving any citizen of the right of suffrage, except in certain cases not pertinent to the present inquiry, it would seem, at first blush, as if any law making it a prerequisite to the exercise of this constitutional privilege that the voter should be registered, would be in violation of the Constitution, as adding an additional requirement to those mentioned in the Constitution for the exercise of this right. But, as we have seen, this is not the correct view of a registration law, which is a mere regulation as to the mode and

manner in which this constitutional right may be exercised. The Constitution simply provides that every citizen, possessed of certain specified qualifications, shall be entitled to exercise the right of suffrage, but it makes no provision as to how the fact shall be ascertained that a citizen claiming the right to vote is possessed of the required qualifications. It is, therefore, not only proper, but necessary, that the legislature should make such regulations as it may deem best for the purpose of determining the question of fact, whether a person offering to vote is possessed of the necessary constitutional qualifications; and this, in our judgment, is the true office of a registration law.

It is, also, nothing but reasonable and proper that such an inquiry should terminate prior to the election, as it might greatly delay, and possibly defeat, the full exercise of the right of suffrage if it had to be conducted while the election was going on; and hence a law which provides for closing the registration books for such a length of time as would be reasonably necessary to enable the supervisor of registration to prepare and furnish the managers of elections at each polling precinct with a copy of the list of registered voters for such precinct, would not, probably, be regarded as an unreasonable regulation. If, however, the law provides for closing the registration books for such a length of time before the election as would be manifestly unreasonable and unnecessary for that purpose, then such a law could not be defended as a legitimate exercise of legislative power; for, under color of regulation, it would have the effect of subverting and injuriously restraining the right of suffrage, and would, in some cases, totally defeat such right. It seems to us, that the law under consideration is open to this objection, for it provides that the registration books shall be closed on the first day of July preceding every general election, which, as we have seen, is fixed for the first Tuesday after the first Monday in November in every second year, reckoning from the year 1870, and shall not be reopened prior to such general election, except for the purpose of enabling minors coming of age and possessed of the other necessary qualifications to register. Surely a period of four months is wholly ·

unreasonable and entirely unnecessary for the closing of the registration books previous to a general election, and the inevitable effect is to deprive a certain class of citizens of the right to vote at such election, to wit: those who, being otherwise qualified, complete their required term of residence, either in the State or county, within such period of four months.

Take, for instance, the case of a person who, being possessed of other constitutional qualifications, only completes the required term of residence, either in the State or county, on the first day of October immediately preceding any general election. By this provision of the law he is deprived of his right of suffrage, although it may be susceptible of proof to a demonstration that on the day of the election he is, and for more than a month preceding has been, fully possessed of all the qualifications of an elector as fixed by the Constitution, simply because he had not performed an impossible act by registering prior to the preceding July, which, under the case supposed, it would have been impossible for him to have done, as he had not, prior to the preceding July, completed his required term of residence. It is manifest that such a law cannot be defended as a reasonable and necessary regulation of the mode of exercising the elective franchise, and is in direct conflict with the Constitution; for, in the case supposed, which, no doubt, has frequently occurred, the Constitution guarantees the right to vote, but the registration law forbids the exercise of such right because the person in question had not shown, four months previous to the election, what it was impossible for him then to have shown—that he was then possessed of all the constitutional qualifications—notwithstanding the fact that there was ample time for him to have shown, if allowed the opportunity, that he was on the day of election, and had been for at least one month, fully possessed of all the qualifications of an elector.

Much complaint has been made in the argument against what may be designated as the certificate feature of the act, which, it is claimed, is peculiar to the registration law of this State, by which it is provided that the supervisor of registration is required to furnish to each registered voter a certificate, in the form prescribed in section 142 of the Revised Statutes, which

he is required to exhibit to the managers of election before he can be allowed to vote, and which forbids him from voting at any other polling precinct than that mentioned in such certificate. We must say, however, that we are not prepared to condemn this act simply on account of that feature. Indeed, if the proper construction of the act is, that the exhibition of such certificate is conclusive of the voter's right to vote, we are inclined to think that such a feature is not only unobjectionable, but preferable to a provision whereby the voter's right to vote is made to depend upon the fact that his name is found on the list of registered voters furnished the managers of election by the supervisor of registration; for, in the former case, the voter is made the custodian of the evidence of his right to vote, whereas in the latter case, his right is made to depend upon the act of another, and he may entirely lose his right by the carelessness or incompetency of an official in making out the list, to say nothing of the danger of his being deprived of his right by the willful omission of his name from the list by a corrupt official. If, however, under a proper construction of the act, it is necessary, as is supposed by some, for which supposition the language of section 155 of the Revised Statutes affords some warrant, that to entitle one to vote he must not only exhibit his certificate to the managers of election, but his name must also appear upon the list furnished the managers by the supervisors of registration, then it does seem that such double requirement is unnecessarily burdensome, well calculated to impede the exercise of the right of suffrage, and sometimes entirely defeat such right, without any fault on the part of the voter; for, though he may have carefully preserved and promptly exhibited his certificate of registration to the managers of election, he yet may lose his right to vote solely because his name does not appear on the list furnished by the supervisor, for the act makes no provision for the publication of the list of registered voters prior to an election, whereby the voter can ascertain whether his name appears on such list, and if it had been omitted through carelessness or even oversight on the part of the official charged with the duty of preparing such list, have it inserted.

We do not deem it necessary to go into any detailed consideration of the various provisions of the act, in regard to the substitution of a new certificate for one which has been lost or destroyed by no fault on the part of the voter, or of the provisions of the change of certificate where the holder changes his place of residence, even from one point to another in the same precinct, but must say that these provisions seem to be unnecessarily harsh and burdensome, and, whether so intended or not, are well calculated to impede and obstruct the exercise of the right of suffrage.

There is one feature of this act which is not without significance. Sections 151–154, Rev. Stat., expressly require that the supervisor of registration "shall immediately preceding each election revise the registration of electors and mark off the names of such electors as have died, and such as have removed from one residence precinct, parish, ward or county to another without notifying him and obtaining a certificate of transfer;" and the other sections referred to make provision for obtaining the names of persons who, within the two preceding years, have been convicted of any offence disqualifying a person from voting, which names shall be erased from the registration list; but there is a singular absence of any like provision for revising the registration list "immediately preceding each election," by adding thereto the names of qualified electors, whose names, from any cause, may have been omitted from the list. The revision thus expressly provided for is altogether one-sided, and cannot, therefore, be regarded as either reasonable or just.

The features of our registration law which have thus been shown to be unconstitutional are so intimately connected with and so interwoven with its other provisions, that the whole act must be declared unconstitutional. If those features which have been specially commented on are eliminated from the act, as they must be if in conflict with the Constitution, then the effect would be that we would have upon the statute book a law in a form which never received the sanction of the legislature, and this cannot be. To use the language of the Michigan court in *Attorney General* v. *City of Detroit*, 44 N. W. Rep., 388, we may say: "This law, being in the respects pointed out both

unreasonable and in conflict with the Constitution, and it being apparent that the legislature would not have enacted the other portions of the act had it foreseen that the courts would declare these parts unconstitutional, the whole act must fall, and be held unconstitutional and void." We must, therefore, conclude that the registration law of this State is unconstitutional, null, and void, and hence any appropriation of the public moneys for the pay of the supervisors of registration for carrying out the provisions of this unconstitutional statute is without the warrant of law, and should be forbidden.

Since the preparation of the foregoing opinion, which was, as usual, submitted to my associates for their consideration, they have both prepared separate opinions, in which, while not considering or deciding what I regard as the real question in the case, they both concur in holding, though differing on one point at least, that the action cannot be maintained on jurisdictional grounds, and hence concur in rendering judgment that the complaint, or petition, as it is called, must be dismissed. Of course, if these jurisdictional grounds are tenable, and this court is without jurisdiction in the case, that is an end of the matter, and any consideration of the merits of the case would be at least superfluous, if not absolutely improper; for the court is without jurisdiction, then, as was said in *Lowry* v. *Thompson*, 25 S. C., at page 419: "It would be not only unnecessary but improper to undertake to decide any of the other questions in case." But as I do not think that any of these jurisdictional objections are tenable, and, on the contrary, am entirely sotisfied that this court has jurisdiction, and is, therefore, bound to decide the issue presented, I must adhere to the views hereinbefore expressed. A proper respect, however, for the views of my associates, which it is always a pleasure to me to pay them, as well as a due regard for the gravity of the issue presented, require that I should not content myself with a simple declaration that I do not consider the jurisdictional objections tenable, but should go on and consider the grounds upon which these objections are based, and this I propose to do as briefly as the importance of the inquiry will permit.

First. It is objected that this is practically an action against

the State, and to which she is an indispensable party. If this be the true nature of the action, then it is clear that this court has no jurisdiction, in the absence of any consent, of which there is no pretense, on the part of the State. The important inquiry, therefore, is, whether this action can, in any proper sense, be regarded as an action against the State. I do not think so, for the following reason: The object of this action is not to affect injuriously any property or right of property of the State. If the plaintiff should obtain judgment in this case no interests of the State could possibly be affected injuriously thereby. In this respect the present case differs widely from the cases of *Lowry* v. *Thompson, supra, Louisiana* v. *Jumel,* 107 U. S., 711, and *Columbia Water Power Co.* v. *Columbia etc. Light & Power Co.,* 43 S. C., 154, which seem to be principally relied upon, for in each of those cases some interest or property right of the State was sought to be affected, while such is not the case in the present action. I think it is clear, therefore, without going further into the authorities, that this case cannot properly be regarded as an action against the State, to which she is an indispensable party.

Second. While it is quite true that a question as to the constitutionality of an act of the legislature should not be considered or decided in a case where such case can be decided upon other grounds, as that is, in fact, nothing more than saying that the constitutionality of an act of the legislature should not be unnecessarily assailed, for considerations of comity and respect, which should always exist amongst the different departments of the government. This principle would forbid the judiciary department of the government from unnecessarily assailing the action of its co-ordinate department, yet when a case is presented to a court for its decision, in which it is necessary for a proper decision that the question of the constitutionality of an act of the legislature should be considered and determined, then it is not only the right but the duty of the court to consider and determine such question; and if the act in question is found to be in conflict with the Constitution, the court should not hesitate so to declare. That, in my judgment, is precisely the attitude of the case now under con-

sideration. The object of the action is to restrain and enjoin certain public officers of the State, who are the custodians of the public funds, from applying any part thereof to an illegal purpose, to wit: the payment of the salaries of certain so-called public officers, supervisors of registration, upon the ground that there is no valid law providing for the appointment of such officers; so that the vital question in the case, and the one which lies at the very foundation of it, is, whether there is any valid law providing for the appointment of supervisors of registration; for, if there is no such valid law, then it is clear that the public funds cannot properly be applied to the payment of the saleries of persons claiming to hold offices not established by law. Now, as there is no doubt of the fact, that what purports to be an act of the legislature has been spread upon the statute books, providing for the establishment of such offices and fixing the salaries thereof, and the only claim is, that such so-called act is without constitutional authority, and for that reason only, has not the force of law, it follows conclusively, that the question as to the constitutionality of what has been termed for convenience the registration law, necessarily arises in this case, and the solution of that question is absolutely essential to the decision of the case. Indeed, outside of questions of jurisdiction and procedure, it is the only question in the case.

Third. Another objection is stated in these words: "If the State could be sued, she would be estopped from interposing the objection, that the services rendered at her instance and for her benefit were illegal. The appropriations show that the State desires the payment of such services. Equity will not, therefore, lend its aid to compel the State indirectly, through the defendants as her fiscal officers, to do that which the State could not be compelled to do in a direct proceeding." It seems to me that this objection ignores the important and vital distinction between the legislature and the State. The legislature is not the State, but is simply one of the agencies or departments of the government, called into existence by the voice of the people, who are the source of all power, as expressed in their Constitution. The legislature can only act lawfully within

the limits prescribed in the Constitution, and any action on their part in conflict with the provisions of the Constitution is without lawful authority, and, therefore, null and void, and not binding on the organic body called the State, or upon the people composing such organic body.

Hence, the inquiry inevitably comes back to the question, whether the registration law, establishing the office of supervisor of registration and providing for the salary of such office, is constitutional. If it is, then, clearly, the present action cannot be maintained; but if it is not, then it necessarily follows that the public funds cannot be lawfully applied to the payment of such salary; and it seems to me that nothing can be clearer than that any taxpayer, whether one or more, may invoke the aid of the court, to prevent the fiscal officers of the State from applying the funds in the treasury to any purpose not authorized by law; for, besides the fact that such funds are derived from taxes levied and collected from the people of the State, and in which, therefore, every taxpayer is more or less interested, the Constitution expressly provides that "no money shall be drawn from the treasury but in pursuance of an appropriation made by law" (article II., § 22), and this prohibition is repeated, in practically the same terms, in article IX., § 12. It is not correct to say that the State has expressed any desire upon the subject until it is shown that there is some valid act of the law-making department of the government establishing the office of supervisor of registration, and fixing the salary of such office.

Fourth. All the other objections to the jurisdiction of this court, except the last, which will be presently considered, are based, as it seems to me, upon a misconception of the true nature and real object of the action. This is not an action by which the plaintiff seeks to obtain relief against a wrong either done or threatened against him as an elector or voter, and the fact that there is no allegation in the complaint that either the plaintiff or any other citizen of the State has been deprived of the right of suffrage, by reason of the provisions of the registration law, is a matter of no consequence, for such an allegation would not be pertinent to the issue presented by this action.

Conceding, for the purpose of this inquiry only, that no citizen of the State, entitled to exercise the right of suffrage, has ever yet been deprived of such right by the operation of the registration law, I am unable to perceive how that could affect the real issue presented by this case. The wrong complained of is that the fiscal officers of the government have expressed their purpose to apply, and are about to apply, a portion of the public funds under their custody to an illegal purpose, and the remedy sought is to prevent such illegal diversion of the public funds from the purpose to which they can alone be lawfully applied. The action is brought by the plaintiff as a taxpayer, and the allegation that he is also a duly qualified elector is wholly superfluous; for I am unable to see any reason why any citizen of the State, who is a taxpayer—a female, for example—whether an elector or not, may not bring an action like this to prevent any illegal diversion of the public funds, in which all the taxpayers, whether electors or not, are interested.

It only remains to consider the last objection to the jurisdiction, which is based upon the well settled doctrine, that a court of equity will not take jurisdiction of a case, where the plaintiff has a plain and adequate remedy at law. The bare statement of the doctrine, is sufficient to show that, in order to sustain this objection, it must appear that the plaintiff has a plain and adequate remedy at law, and, in my judgment, this has not been and cannot be made to appear. What other remedy a taxpayer has to prevent an illegal diversion of the public funds by the fiscal officers of the government, than that adopted in the present case, has not been suggested, and I am at a loss to conceive of any. It will be observed, that the fund here in question was derived from taxes levied under and by virtue of the act to raise supplies for the fiscal year commencing 1st November, 1893, "for the purpose of meeting appropriations to defray the current expenses of the government" for that fiscal year, and, so far as I am informed, there never was any special or separate levy of taxes to pay the salaries of supervisors of registration. How, then, was it possible for the taxpayer to raise the issue here presented, by refusing to pay his taxes, or by paying the same under protest, and bringing

an action to recover them back? The action does not and could not proceed, upon the ground that any wrong was done to the taxpayer in levying and collecting the taxes from which the fund in question was derived, for such taxes were levied and collected for an entirely lawful and proper purpose—the payment of the current expenses of the State government—and hence no resistance, in any form, could have been made to such levy and collection. But the wrong complained of is, that after the fund derived from taxation had been properly placed in the treasury, a portion of it is about to be diverted from the legal purposes to which it is properly applicable, and applied to an illegal purpose; and how that wrong can be prevented, except by an injunction forbidding the officers charged with the custody of the fund from so misapplying it, I must confess I am utterly unable to conceive.

I cannot, therefore, concur in the conclusion reached by the majority of the court, that the complaint should be dismissed for want of jurisdiction. On the contrary, I am satisfied that this court has jurisdiction, and is bound to decide the real question in the case, viz: the question as to the constitutionality of the registration law. Upon that question, I have hereinbefore set forth the reasons for my conclusion, to which I still adhere, that the said law is clearly unconstitutional. I am, therefore, of opinion, that the prayer of the complaint, in so far as it seeks to enjoin the comptroller general from drawing any warrant on the State treasurer, for the pay of any supervisor of registration, and to enjoin the State treasurer from paying any such warrant, should be granted.

                                             Petition refused.